Thank you, your honor. May it please the court. The board committed two errors, each of which independently warrants reversal. First, the adverse credibility determination is not supported by substantial evidence. The totality of the evidence told a consistent story about an unprovoked assault at the hands of political rivals. Mr. Valentin provided a reasonable explanation for his confusion about the precise timing of events. In particular, he was beaten up by six men in the middle of the night and thought he was near death. Second, the board abused its discretion by failing to consider all evidence relevant to the convention against torture claim. The board completely failed to consider the country conditions evidence, which supported petitioners claim that they're likely to be tortured in Haiti because of their affiliation with the Mocrena political party. Both the IJ and BIA relied exclusively on an adverse credibility determination from the asylum context in denying the convention against torture claim. Their failure to consider all relevant evidence violated the regulations that explicitly require consideration of all evidence, as well as this court's repeated statements in Comalfos and since then, that an adverse credibility determination from the asylum context cannot wash over a convention against torture claim. As recently as March of this year, this court has relied on Comalfos to grant a petition for review where the board relied exclusively on an adverse credibility determination made in the asylum context to the same reasoning should apply here. The IJ denied asylum because she did not find Mr. Valentin's testimony to be credible. And then she based the denial of the cat claim on the same credibility determination without considering any other evidence relevant to that claim. Counsel, if the if the if the question of adverse credibility goes to whether one is politically active or whether one has been persecuted in the past, why would that be? Why would that be quite relevant to the question as to whether you would be tortured in the future? Well, the adverse credibility determination might be relevant, but here there is no indication that the IJ or the BIA considered the other evidence that went to the cat claim, in particular, the evidence about the treatment of the Mokrina political party in Haiti, the political violence committed by the AAA, the Haiti inaction party. Correct. If you're correct, counsel, then it would suggest that any member of the Mokrina party would be entitled to cat relief in the United States. Well, not necessarily, your honor, because this court has recognized that even where the petitioner is found not credible for purposes of asylum, the country conditions evidence relevant to the cat claim can inform the credibility determination for that claim as well. So the the adverse credibility determination does not necessarily carry over to the cat claim once you properly consider the other supporting evidence for that claim. Counsel, may I interject a question, please? So when I read the board decision, I didn't see anywhere they mentioned the country conditions report. Am I correct that there's no mention of country conditions report in the board decision? That's correct, your honor. And is that true of the IJ decision? Did the IJ ever talk about the country conditions report? The IJ did not talk about the country conditions report either. The government argued that the IJ's mention of the supporting documents at Exhibit 3 indicated that the IJ did consider the country conditions evidence. But when you look at the IJ's opinion, it's clear that she considered the documentary evidence for purposes of the asylum claim because she relied on those documents for the adverse credibility determination. But there's no mention whatsoever of the country conditions. And then when you get to the against torture claim, it's based solely on the credibility determination. And my last factual question was this. Is there anywhere in the record where the board said that it had reviewed all the evidence in the record? Because there's in some cases we've applied a presumption of regularity when the board indicated that. I don't believe the board ever made that indication, your honor. The totality of their discussion of the convention against torture claim is that they affirm the IJ's denial based on the credibility determination. The board says that the is based entirely on the same premises as the asylum claim. But of course, that's an incorrect characterization of the petition, which included additional supporting evidence relevant to the convention against torture claim. Thanks. Why don't you move to the adverse credibility? Because I think much here will turn on how successful you are on this question. Thank you, your honor. In terms of the adverse credibility determination, I think the primary problem with the IJ's determination is that the judge held Mr. Valentin to too high a standard in terms of how precise he was in the timeline of this attack that occurred in the middle of the night. This court has made clear that requiring a petitioner to recall precise details about exactly when something occurred, even exactly what date something occurred, is a poor way of conducting a credibility determination. Here, we're talking about an attack that happened while the petitioner was asleep and an event that occurred more than five years before the hearing took place. So if you don't conduct the sort of cherry picking that the IJ did and look at the totality of the evidence, you see a clear picture, a consistent picture, about a series of harassing and threatening phone calls, an attack that took place sometime around the 20th of September in 2013 that left the petitioner with a broken arm that was breaking through the skin, forced him to be hospitalized for 15 days after that, and then another set of harassing and threatening phone calls a few months later. The magistrate report, the doctor's report, were consistent with the testimony about that event occurring and the reason for that attack occurring. Okay, Ms. Eagle, maybe you could reconcile something for me as to your position. If I'm recalling correctly, like the petitioner said that he was unconscious after the attack, but then in another place said there was a verbatim transcript of what he had said. If I'm remembering that right, why isn't that an inconsistency? Because it's kind of hard for a person to say things when they're unconscious. Thank you, Your Honor. The testimony was not actually that the petitioner was unconscious. He described feeling like he was close to death, feeling a little bit out of it. I think a better characterization of that testimony is that he was in shock. He was certainly in a great deal of pain when he had an open fracture and had been beaten with batons and guns while he was sleeping, but he specifically did not testify that he was unconscious. He clarified explicitly that he was able to hear, he was able to see everyone around him, so that particular characterization was a mischaracterization. Was the person making the transcript the person who spoke the same language as the petitioner? That particular fact is not in the record, but it is in the country conditions evidence that the judicial system in Haiti is conducted in French, but petitioner speaks Creole, and that's a problem with the judicial system in Haiti for a lot of people, so that may have been a factor here. Okay. If I may, I'll reserve the balance of my time. I have one more question for you. I'll give you an extra minute or two if you need it. My question is this. If I recall, there was some suggestion that when the petitioner was asked who was with him at some ceremony, he said he was alone. There's so many immigration cases. I might be confusing one with another. Does that ring any bell here? I don't think there was a ceremony involved in this case, Dave. Thanks. Do you want to plan? I'll give you two minutes for a bow. Thank you. Dave, Ms. Bruckner. Thank you, Your Honor. May it please the court. My name is Patricia Bruckner, and I represent Attorney General Merrick Garland. Valentin's entire claim of past persecution is based on one alleged beating by a rival political party in Haiti. He was required to remember the details of only one incident and testify consistently about it, yet his documentary evidence, an alleged abstract by the magistrate court transcribing his interview, and a medical certificate about his treatment following the assault, undermined his testimony about the date of the assault. Also, his own testimony in immigration court was riddled with inconsistencies as to the time of the assault. And although the Real ID Act does not require that adverse credibility factors relate to the heart of the claim, these bases were central to his claim of past persecution. Valentin also failed to testify at first or include in his application the assistance he allegedly received from neighbors following the assault. The totality of the circumstances and this cumulative evidence of inconsistencies fully support the adverse credibility finding. A reasonable adjudicator would not be compelled to disagree with the agency's decision. Counsel, I'd like to start with the question of the date on which the attack occurred. I'm on page 316 of the administrative record. These are questions to Mr. Valentin from, I think, government's counsel. And I'm looking at line eight. Are you with me? Yes, I am. Okay. So the question is from the government is, so did they break into your house at 2 a.m. on September 20 or two on September 21? In some respects, that may be a misleading question. It presumes that the attack began on the 20th or the 21st. And it just gets quite inconsistent from there because I think there's a great deal of confusion in the way the question has been asked. Um, it looks to me as though the attack had to have had to have begun at 11 p.m. on the 19th, not on the 20th. And if you assume that it looks like his story is consistent after that. Um, that's interesting, Your Honor. But if you go two lines up to line six or line four, the ICE counsel asked, what time of day did they break into your house? And the petitioner said it was in the evening, about two o'clock at night. So that was volunteered by him. And so that was his first response. So counsel then, I think, is trying to give him the benefit of the doubt because he sees that there's contradictory documentation that petitioner submitted, which, you know, he he was interviewed on the morning of which says he was interviewed on the morning of the 20th. And so he's trying to clarify, um, whether it was, um, 2 a.m. on the 20th or on the 21st. Yeah, but it doesn't there doesn't appear to be any support for the question as to whether this heard on the found occurred on the 21st. Yeah, I see your point, Your Honor. Um, I think the counsel was a little confused. It started at 11. And he said, and other places, he said, well, it started about 11 p.m. And it was all over by two. And 11 would have been on the 19th, two o'clock a.m. on the 20th. The magistrate comes, the neighbors come over, help him with the sling, and then the police take him to the hospital. And that story, if you assume sort of that order, everything seems to square up pretty well. It's not perfect, but it squares up pretty well. But there's a lot of confusion. I think that gets introduced by the government counsel's question. I think that the government counsel misspoke there and was thinking about the disparity between September 19th and 20th. And that's why the question was asked. But I don't think it reconciles or explains all of the inconsistency in the times, in the date. I'm sorry. Because actually, so there are inconsistencies in the time and in the date. First, as to the date, Valentin was completely consistent that it occurred on the evening of September 20th. He never wavered on that. And those record sites are 296, 315 to 16, and 334. It's his documents that undermine them. Both documents, the medical certificate and the magistrate for abstract. But the question as to whether it occurred before midnight or after midnight are open questions, because he has testified that things may have occurred before midnight. He said he was asleep. So it's not clear that he really knew what time all of this actually occurred. But whether it occurred before midnight or after midnight, everything pretty much squares up. And all right margin justifies here if you assume that the attack began just before midnight on the 11th, on the 19th, and then was completed after midnight on the 20th. All the other, the hospital reports, the magistrate's reports, everything else squares up. Well, I would counter though, that he's given three different times for when those intruders first broken. First, he testified it was 2am. And then he said they arrived around midnight. And the assault lasted until 2am. That's at 316. And then he tried to explain this discrepancy by saying, oh, 2am was stuck in my head, because that's when I went to the hospital. But then he was confronted with his application and his declaration, which said the assault started at 11pm, a third time. And so now at this time, he changed his testimony. And he said, Oh, actually, the intruders arrived at 11pm. But it was 2am by the time they left. I have a question. I will have the question I want to follow up with. Isn't it? Isn't there more fundamental problem here, which is, I believe there's case law that says that minor discrepancies in dates can't be viewed as attempts by the applicant to enhance his claims of persecution. In other words, you know, he's injured. He's, you know, this, this is a traumatic event. You know, whether it happened at midnight or two o'clock in the trivial, I mean, isn't there nine circuit cases that I think it's Randy holder that talk about this specifically and say, is that really an issue of credibility? Your Honor, thank you for raising that point. I think stress the 2010 precedent explains this. It talks about trivial inconsistencies, such as typographical errors, um, and clerical errors, but it also in the, in, in Shrestha, the IJs, um, um, inconsistent inconsistency determination applicants account, which the malice inquired about him and they found this inconsistency was not merely trivial. Um, they no longer need to go to the heart of the when an inconsistency is at the heart of the claim, it is doubtless of great weight. Um, and Shrestha asserted fear of the malice formed the crux of his application for relief. So even though this is about the time and about the date, um, those inconsistencies related to his one act of past persecution that he was alleging. And I think based on this, um, this would not be merely trivial. These inconsistencies, in fact, went to the heart of his claim. I'd also like to distinguish the Singh case, which, um, petitioner relies on because, um, that also dealt with, um, inconsistencies and found, uh, the case that inconsistencies in that case were trivial, Singh v. Gonzalez, a 2005 case. Um, but in that case, the facts involved discrepancies between two sets of arrest states out of four. Singh reported on his asylum application versus his, uh, I'm sorry, in his asylum interview versus his application. Yeah. Your time is running quickly. And I do have a couple of other questions that I would like that are pertinent to this case rather than to, than to sing. Okay. I'm sorry. I was trying to distinguish Singh. Thank you. I understand. Um, does, um, did the IJ find that this incident did not occur? That is, has the government challenged the authenticity of the magistrate's report or the hospital report? And did the IJ and the BIA, um, conclude that those, that those were not genuine documents? The, um, the IJ did conclude that, um, one of the documents was not, um, was not authentic. I think it was the abstract. The IJ said the abstract was not authentic and the IJ also called into question the medical certificate because, um, he said that that was created in 2018 for the purposes of litigation. Um, okay. Do you know which page, which page the, um, the, the court found that the, uh, that the magistrate's report was not authentic? Um, I'm looking for that, your honor. Um, on page, on page five, it's, it's, uh, AR 21, but it's page five of the, of the report. Um, the IJ concludes it's not believable that what appears to be a verbatim transcript but I'm not sure why that, why that's, why that's important. Um, but we, we have, we create transcripts all the, all the time from credible fear interviews. I don't know why a magistrate interviewing somebody couldn't relate in a report, um, questions that were asked and questions that were answered. Right. I understand your honor. Um, I found it. It's on, um, page six of the immigration judge decision. I don't have the record site on that, but, um, he's talking about the third basis, whether, um, respondents, whether a petitioner's arm was in a sling, uh, because the neighbors had helped him and, um, the judge said it's not believable and the documents are not bona fide. You know, uh, counsel, I was, I was a Boy Scout and it doesn't take a lot to put an arm in a sling. That's, that's pretty basic stuff. And if somebody's got an exposed bone, putting somebody in a sling might not rise to the level of medical attention. Um, it's kind of first, it's kind of first aid without, uh, without, um, you know, prejudging that a doctor might decide to do something different if you actually got to the hospital. That's quite plausible, your honor. And, um, the government concedes that one inconsistency is perhaps not as strong as the others, but under the totality of the circumstances, it can be fully supports the adverse credibility finding, even if it is somewhat weaker than the others. Um, as far as, um, as far as Valentin's explanations for, um, for all of his inconsistent times that he provided, his, his counsel at the time had to lead him on redirect with, um, leading questions and, um, the record 334 to 337. And he, in fact, um, basically testified for him in essence. And he kept asking all these questions. And then Valentin said, yes, that's right. That's right. And he ended up giving like six different reasons. Well, that also calls into question his, his credibility. He was awakened. He didn't have a clock. He had to estimate, he lost sense. He specifically said he lost consciousness. Um, contrary to what, um, counsel has said, he wasn't himself. He feared for his life. He thought he was gone, but then he came back from this state when he was at the hospital. So he only provided, he was only provided explanations, um, when he was completely led on redirect. And it really calls into question, um, the possibility of these explanations. Also that the immigration judge was not required to credit these explanations. That's clear under stress, uh, when the record suggested, um, more plausible explanations. Um, there's nothing compelling the immigration judge to credit these explanations, especially when, when he was led by his counsel to provide them. Counsel, if Judge Gould, if I could ask you a question. If a leading question is asked in the immigration proceeding, then there's an objection to it. Can the IJ still admit it or not? Um, you know, your honor, I don't know the exact question. The exact answer, the federal rules of evidence do not apply. So the immigration judge certainly has more, um, flexibility in admitting evidence and, um, and determining the weight to apply to evidence. Right. So, so if, if, if the rules, strict rules of evidence don't apply, then wouldn't an IJ be free to take leading testimony into account? Um, absolutely, your honor. And, and in this instance, the immigration judge, um, did not credit these explanations and certainly was not required to do so given the evidence in the record. Hey, thanks counsel. Unless Judge Cardone, Judge Bybee, have further questions. I don't have any further questions. Um, I believe my time has expired. Right. So therefore we'll thank, uh, Ms. Bruckner for valiantly appearing by phone despite all the hazards of life these days. And we'll, we'll let, uh, Ms. Siegel conclude. Thank you, your honor. Thank you, your honor. Just one point of clarification on the testimony about losing consciousness. I would point the court to page 336 in the record where Mr. Valenti was asked about whether he had lost consciousness and what he meant by that. First, I would remind the court that this was all taking place through translation, but then, uh, point to the testimony at, um, line 20 of page 336 where Mr. Valenti says what he meant by losing consciousness was that, I mean, I wasn't really myself because I wasn't myself anymore because I just thought I was going to be dead. I was thinking of death. Later, he says, I could hear what was going on around me. So he did not testify that he lost consciousness in the sense of blacking out or how he might think about that. Counsel, I have, um, as you, as you no doubt heard, I, I, I have a number of questions about, uh, the triviality or non-triviality of the, of the discrepancies over the time and the, and the date. And I think there's a number of problems, uh, for both sides. Um, on page four of the IJ's opinion, the IJ recites that the court has had the opportunity to observe the respondent's demeanor when he testified. We don't always get an observation from an IJ about demeanor. Um, and, um, and the court then says, in my judgment, there are inherent inconsistencies in the document and inconsistencies between the oral testimony and the contents. Um, is that, is that a demeanor finding? And if it's a demeanor finding, how do we find that that is, that the evidence would compel a contrary conclusion if there's a demeanor finding here? I don't think that's a demeanor finding, your honor. There's no comments about anything about the demeanor other than the judge was able to observe the witness giving testimony. All of the reasons, but now, now it feels like we're sort of tripping up the IJ over, over not using the mother may I words because the IJ says, look, I've listened to him. I've listened to listening to this guy. And there are a number of inconsistencies in the document and there written testimony and his oral testimony. Now I, I tripped up, I tripped up government council just a little bit, but we should point out that, that Valentine's declaration says that it started at 11 PM on the 20th, which means that in that sense, the government government council's question was correct. In which case the documents from the magistrate and the hospital are fraudulent. Well, I don't think there's any indications on those documents that they're fraudulent, your honor. Um, I agree with your previous characterization of the most natural way to read the, the testimony and the documents together is that this event began. What do you do with Valentine's declaration? He says they came at 11 PM on the 20th. That means that they left at two at 2 AM on the 21st. Elsewhere, Mr. Valentine testified clearly that he didn't know exactly what time began, but the date that he's put in his declaration is utterly inconsistent with the written, with the written documents from the magistrate and the hospital, if he's correct there. So do we believe Mr. Valentine on the declaration or is he wrong in the declaration and correct on the stand? I think it's most likely that he's wrong in the declaration. And there I would remind the court, um, about seeing versus Gonzalez and other cases where this court has made clear that these minor inconsistencies in this case, we're talking about a matter of a few hours, um, in recalling a particularly traumatic event is a particularly harsh and inaccurate way of conducting a credibility determination. If there are no further questions, we would ask that the court grant the petition for review. Thank you, Ms. Siegel. Let me just, uh, if I don't hear further questions from Judge Cardone or Bybee, that will conclude the argument, except I want to again, thank counsel on both sides of the case for appearing during the time of pandemic with all of its risks. We really appreciate your providing remote argument in this way. So without further ado, Valentine B. Garland shall be submitted and the panel will adjourn for the day. This court for this session stands adjourned.
judges: Gould, Bybee, Cardone